LEONARD J. HARRINGTON & others [1] *vs*. FALL RIVER HOUSING
AUTHORITY & others.[2]

No. 88-P-164.

Bristol.   March 10, 1989. — May 11, 1989.

Present: WARNER, KAPLAN, & FINE, JJ.

*Housing. Housing Authority. Frauds, Statute of. Contract*, What con-
stitutes, To guarantee rent payments. *Estoppel*.

In an action brought by property owners participating in federally funded
   low income housing programs against the local housing authority for its
   failure to continue under a 1974 program to guarantee rent payments
   for certain housing units for the terms of years agreed to under a 1967
   housing program, the judge erred in concluding the plaintiffs were en-
   titled to the guaranteed benefits, where the plaintiffs had abandoned
   their rights under the 1967 program by converting to the successor 1974
   program without exercising options to renew the guaranteed leases, and
   where oral statements of the housing authority's staff that guaranteed
   rental payments would continue under the successor program, in con-
   tradiction of the specific written terms of the 1974 leases, were unenforce-
   able inasmuch as they constituted "a contract for . . . tenements . . .
   or of any interest in or concerning them" within the Statute of Frauds
   set forth at G. L. c. 259, § 1. [306-307]
In an action brought by property owners participating in federally funded low
   income housing programs against the local housing authority for its
   failure to continue under a 1974 program to guarantee rent payments
   for certain housing units for the terms of years agreed to under a 1967

---

[1] Forty-six other owners of rental property in Fall River participating in
Federal leased housing programs. Sixteen of them were omitted from an
amended complaint filed in the case.

[2] Members of the Authority. For purposes of this appeal, the parties have
agreed to treat the Authority as the appellant.

housing program, seeking declaratory and injunctive relief and damages, the judge erred in concluding the authority was equitably estopped from refusing to guarantee the payments because of misrepresentations by its staff, where (assuming estoppel principles to be applicable) the plaintiffs did not establish that their reliance on the misrepresentations was reasonable or that they had suffered any loss traceable to the misrepresentations. [307-311]


CIVIL ACTION commenced in the Superior Court Department on July 6, 1981.

The case was heard by *George P. Ponte*, J., and was reported by him to the Appeals Court.

*John C. Corrigan, Jr.* (*Kenneth L. Sullivan* with him) for the defendant.

*Jeffrey S. Entin* for the plaintiffs.

FINE, J. A number of property owners in Fall River who participate in federally-funded programs for housing low income tenants brought this action[3] against the Fall River Housing Authority (Authority). They allege, on contract and estoppel theories, that the failure of the Authority to agree to continue to guarantee payment of rent for certain of their rental units for eighteen years, or in some cases, fifteen years, whether the units were occupied by low income tenants provided by the Authority or were vacant, entitles them to declaratory and injunctive relief and damages. After a lengthy jury-waived trial, limited to the question of liability, a Superior Court judge ruled in the plaintiffs' favor. A partial judgment entered ordering the restoration of guaranteed rent payments, regardless of vacancies, and ordering that a further hearing be held to determine damages. Before any hearing was held on damages, the judge reported the question whether his findings, rulings and

---

[3] Although the forty-seven plaintiffs alleged the same course of conduct on the part of the Authority and the same theories of liability, they did not seek to have the case certified as a class action.

orders on liability were proper.[4] See Mass.R.Civ.P. 64, 365 Mass. 831 (1974). As we do not agree that the Authority is liable to the plaintiffs, we reverse the partial judgment.

We summarize the facts found by the judge. The Authority is a local public housing agency, created pursuant to G. L. c. 121B, with responsibility for administering and directing housing programs in Fall River, among them those assisted by the United States Department of Housing and Urban Development (HUD). In 1965, Congress enacted the Housing and Urban Development Act. Pub. L. No. 89-117, § 1, 79 Stat. 451 (codified as amended in scattered sections of 12, 15, 20, 38, 40, 42, and 49 U.S.C.). Under 42 U.S.C. §§ 1437 et seq. (Section 23 program), in an effort to expand the supply of housing for low income families, property owners were encouraged to construct new rental units and to renovate existing ones.

Around 1967, the plaintiffs were approached about participating in the Section 23 program. Staff of the Authority informed them that if they would build new housing or suitably rehabilitate their existing property, the Authority would supply tenants and guarantee leases for up to eighteen years for newly constructed units and fifteen years for substantially rehabilitated units. The leases would provide for payment of rent for the units even while vacant. In addition, the Authority would assume responsibility for collecting rents, evicting tenants, and maintaining the rental property. The Authority issued letters of intent incorporating these promises to the plaintiffs and to their prospective lenders. Relying upon these promises, the plaintiffs, at considerable expense, performed the work.

The Authority entered into leases with the plaintiffs for the rental units. All of the leases contained clauses guaranteeing

---

[4] See *Federici* v. *Mansfield Credit Union*, 399 Mass. 592, 593 n.2 (1987). The findings, rulings and order were made on September 22, 1983, and judgment entered on October 4, 1983. Between that date and June 22, 1987, when the judge reported the case, there were several contempt hearings, and the parties engaged in settlement negotiations. Settlements were reached with thirteen property owners. We pass the question whether it was proper to report the partial judgment under Mass.R.Civ.P. 64, 365 Mass. 831 (1974), as no purpose would be served by our not answering the reported question.

full rent, regardless of occupancy. While the lease terms ranged between one year and five years, they contained provisions allowing the owners the option to renew for up to fifteen or eighteen years, depending upon whether the units were newly constructed or renovated. The options to renew were to be exercised in writing at least sixty days before the leases expired. None of the leases provided for any rent increases. Periodically until 1973, however, rent increases were negotiated, and new leases, with terms identical to those in the original leases except for the rent, replaced the existing leases. Rental increases could be paid only if there were sufficient funds in the Authority's budget. Beginning in 1973, due to a Federal funding freeze, the Authority had insufficient funds to pay the plaintiffs any rent increases. As a result of rising costs and the static rents, many of the plaintiffs experienced financial hardship with respect to their Section 23 rental units.

In 1974, Congress created a new leased housing program under Section 8 of the Housing and Community Development Act of 1974 (Section 8 program). Pub. L. 93-383, 88 Stat. 633, 42 U.S.C. §§ 5301 et seq. This program incorporated a new philosophy favoring tenant mobility. Although, under the Section 8 program, the Authority could grant long-term guaranteed leases for newly constructed and rehabilitated housing, any units converted from the Section 23 program were to be considered existing housing, subject to a "finders-keepers" policy. Tenants would be issued certificates that could be used for any rental property they might find which met the program's housing standards. See 24 C.F.R. § 882.103 (1975). Landlords would be guaranteed neither a steady stream of tenants nor rent payments for vacant units.

HUD's policy was to convert as many Section 23 units to Section 8 as possible. See 24 C.F.R. § 882.101(b)(2) (1975). Although landlords were to be encouraged to convert, they had the right under the applicable HUD regulations to continue in the Section 23 program, and any conversion to Section 8 had to be voluntary. See 24 C.F.R. §§ 882.101(b) (1975), 882.123(c) (1979) and 1277.101(c) (1974). Limitations on rent increases for Section 23 units were imposed on the Authority. See 24 C.F.R. § 882.101(b)(5)(ii) (1975).

In 1975, the plaintiffs were called to a meeting with staff of the Authority to discuss converting their units to Section 8. The plaintiffs were told that they would receive rent increases if they converted to the Section 8 program, but not if they remained in the Section 23 program. The Authority's staff told the plaintiffs that they had no choice but to convert to Section 8 and that, upon conversion, they would continue to have the benefits of the guaranteed leases. That is, the Authority would continue to provide them with tenants and rents would be paid for their units regardless of occupancy. On the other hand, the plaintiffs would have to assume responsibility for collecting rents, evictions, and some repairs.

The Authority officials making the representations to the plaintiffs were unfamiliar with the applicable HUD regulations. According to those regulations, the plaintiffs could not be forced to convert their rental units from the Section 23 program,[5] and guaranteed leases were not authorized for existing housing under Section 8.[6] The plaintiffs, nonetheless, relied on the representations made on behalf of the Authority and converted their units to Section 8.[7] They signed new leases which made no provision for the Authority to supply tenants or to guarantee the payment of rent for vacant units. As promised, the rents were increased, and, until July of 1980, the Authority continued to supply a steady stream of tenants and to pay rent for vacant units. At that time, at HUD's direction, the Authority began to enforce the Section 8 "finders-keepers" regulations. Consistent with those regulations, tenants were free to choose their own units. See 24 C.F.R. § 882.103 (1975). Vacancies began to occur in some of the plaintiffs' units, and the Authority discontinued the practice of paying rent for the vacant units. The plaintiffs protested the changes and asked the Authority to seek from HUD a waiver of the Section 8 regulations, but the Authority refused to do so, and this litigation ensued.

---

[5] See 24 C.F.R. § 882.101(b)(1) [effective as of 1975]; 24 C.F.R. § 882.123(c) [effective as of 1979].

[6] See 24 C.F.R. § 882.101(a)(2) (1975) and § 882.103 (1975).

[7] Some properties were not converted from Section 23 until 1979.

The judge ruled that the plaintiffs were entitled to the benefit of the guaranteed leases for the fifteen- or eighteen-year periods promised at the outset of the relationship between the plaintiffs and the Authority. He determined that the Authority was bound by its original oral and written contracts with the plaintiffs and by its oral promises in 1975. Alternatively, the judge ruled that the Authority was estopped, because of the oral misrepresentations by its staff, to rely on the conversion of the plaintiffs' units to the Section 8 program.

We assume that the elements of an enforceable contract were present at the outset, given the oral representations made, the letters of intent provided to the plaintiffs and their prospective lenders, and the plaintiffs' change of position in reliance on the promises by taking out loans and spending substantial sums to construct or rehabilitate their rental property. The Authority fully complied with its promises, however, by entering into the Section 23 leases with the plaintiffs which incorporated all the terms of the agreement and specifically included provisions giving the plaintiffs options to renew the leases for the specified fifteen- or eighteen-year periods. The plaintiffs abandoned their rights under those leases, however, without exercising the options, when they converted to the Section 8 program. There is no liability, therefore, for breach of the original agreements.

The oral promise made at the 1975 meeting to continue paying rent for all the units regardless of occupancy was not an enforceable contract. The agreement to lease rental units under the Section 8 program falls within the Statute of Frauds as "a contract for . . . tenements . . . or of any interest in or concerning them" and must, therefore, be in writing to be enforceable. G. L. c. 259, § 1, Fourth. See *O'Brien* v. *Hurley*, 331 Mass. 172, 176 (1954), cert. denied, 350 U.S. 940 (1956); *Whaler Motor Inn, Inc.* v. *Parsons*, 2 Mass. App. Ct. 477, 482 (1974). In order to satisfy the Statute of Frauds, the writing must incorporate the promise that the plaintiff seeks to enforce. See *Hall* v. *Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 93 (1987). "The memorandum must be accurate and it must contain all the provisions of the oral contract with which the plaintiff is seeking to charge the defendant." *A. B. C.*

*Auto Parts, Inc.* v. *Moran*, 359 Mass. 327, 330 (1971). Here, the plaintiffs entered into an individual Section 8 lease with HUD for each unit being leased to a particular tenant for a stated term, not to exceed three years. Thus, there were no written leases or any other writing concerning any vacant units. Moreover, the Section 8 leases contain explicit provisions limiting the time of rental payments for vacant units and restricting such payments to units vacated by tenants without justifiable cause during the term of the lease.[8] As the oral promises made by the staff of the Authority regarding guaranteed rent directly contradict the explicit terms of the Section 8 leases, they may not be admitted as parol evidence. See *A. B. C. Auto Parts, Inc.* v. *Moran*, 359 Mass. at 330. Cf. *Alexander* v. *Snell*, 12 Mass. App. Ct. 323, 325 (1981). Compare *Holmes Realty Trust* v. *Granite City Storage Co.*, 25 Mass. App. Ct. 272, 276 (1988) (ambiguity in meaning of lease).

We consider, therefore, the judge's alternative basis for imposing liability on the Authority. Estoppel is an equitable doctrine created to prevent one from benefiting from his own wrongdoing and to avoid injustice. See generally *Loranger Constr. Corp.* v. *E.F. Hauserman*, 376 Mass. 757, 760-761 (1978); *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 727-728 (1974). At the 1975 meeting with the plaintiffs, Authority officials made two serious misrepresentations. First, the Authority officials told the plaintiffs that they could not remain in the Section 23 program, their only choice being to convert their rental units to Section 8 or leave the Federal leased housing program altogether. Second, the plaintiffs were told that under Section 8 the Authority would continue to supply tenants and to guarantee the payment of rent regardless of occupancy. The

---

[8] For example: "If the Family vacates the unit in violation of the Lease, the Owner shall receive the housing assistance payment due under the Contract for so much of the month in which the Family vacates the unit as the unit remains vacant. If the unit continues to remain vacant, the Owner shall receive from the PHA a housing assistance payment in the amount of 80 percent of the Contract Rent for a vacancy period not exceeding one additional month, or the expiration of the contract term, whichever comes first."

In addition, the Section 8 leases contain an integration clause stipulating that the lease contains the entire agreement between the parties.

officials who made those statements may have been ignorant of the applicable HUD regulations, but they certainly should have been aware of their content. We do not condone such conduct. The plaintiffs relied upon the misrepresentations and, as a result, converted their rental units to the Section 8 program. Between 1980 and 1984, prior to obtaining injunctive relief, they experienced vacant rental units for which no rent was paid by the Authority, and they were forced to rent some units to tenants on the private market at rents below the level the Authority was paying at the time for the Section 8 units.

Estoppel theories generally do not apply against the government. See *Heckler* v. *Community Health Servs., Inc.*, 467 U.S. 51, 66 (1984); *Falcone* v. *Pierce*, 864 F.2d 226, 228 (1st Cir. 1988); *LaBarge* v. *Chief Administrative Justice of the Trial Court*, 402 Mass. 462, 468 (1988); *Gamache* v. *Mayor of No. Adams*, 17 Mass. App. Ct. 291, 294 (1983); *McAndrew* v. *School Comm. of Cambridge*, 20 Mass. App. Ct. 356, 360-361 (1985); *Stadium Manor, Inc.* v. *Division of Admn. Law Appeals*, 23 Mass. App. Ct. 958, 961-963 (1987), and cases cited. The reluctance to extend estoppel against the government stems from concern over public fiscal policy, sovereign immunity and administrative efficiency. See *McAndrew* v. *School Comm. of Cambridge*, 20 Mass. App. Ct. at 360-361. We need not rely on the government nonestoppel principle, however, because not all of the traditional elements of estoppel have been established in this case. The three traditional elements are: "first, a material misrepresentation of a party who had reason to know of its falsity; second, reasonable reliance upon the misrepresentation; and third, some disadvantage to the party seeking to assert estoppel fairly traceable to the misrepresentation." *Falcone* v. *Pierce*, 864 F.2d at 228. See *Boston & Albany R.R.* v. *Reardon*, 226 Mass. 286, 291 (1917); *Franklin County Realty Trust* v. *Assessors of Greenfield*, 391 Mass. 1018, 1018-1019 (1984); *O'Blenes* v. *Zoning Bd. of Appeals of Lynn*, 397 Mass. 555, 558 (1986); *National Medical Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 580 (1984). See also Restatement (Second) of Contracts § 90[1] (1981); Restatement (Second) of Torts § 894(1) (1977). A party

relying on an estoppel theory has a heavy burden to prove that all the elements are present. See *Jones* v. *Department of Health & Human Servs.*, 843 F.2d 851, 853 (5th Cir. 1988).

The plaintiffs failed to establish reasonable reliance. Notwithstanding the trial judge's finding that the plaintiffs' reliance on the Authority's misrepresentations was reasonable, we conclude that such reliance was unreasonable as matter of law. The plaintiffs had participated in Federal housing programs for several years and ought reasonably to have known that HUD regulations governed their implementation. HUD's regulations were published and publicly available, and reference to them would have revealed to the plaintiffs that their consent was required for any conversion from the Section 23 program and that, under Section 8, their units would be considered existing housing and would not have the benefit of guaranteed leases. As the Supreme Court said in *Heckler* v. *Community Health Servs.*, 467 U.S. at 63-64: "[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law . . . . [A]s a participant in [a Federal] program, respondent had a duty to familiarize itself with the legal requirements . . . . [The government cannot] be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable . . . ." In *Falcone* v. *Pierce*, 864 F.2d at 228, where a property owner also had a long-term participation in HUD programs, the court stated that "not only is he properly charged with knowledge of the requirements of various HUD programs, but . . . had [he] consulted an attorney, he likely would have avoided relying on the improper advice of HUD officials." In Massachusetts, also, one relies at his peril on representations by a government official concerning legal requirements. See, e.g., *Holahan* v. *Medford*, 394 Mass. 186, 190-191 (1985); *O'Blenes* v. *Zoning Bd. of Appeals of Lynn*, 397 Mass. at 558, and cases cited; *LaBarge* v. *Chief Administrative Justice of the Trial Court*, 402 Mass. at 468-469; *McAndrew* v. *School Comm. of Cambridge*, 20 Mass. App. Ct. at 360-361, and cases cited. Particularly where misstatements about the effect of applicable rules and regula-

tions relied upon are oral, reliance on them may not be regarded as reasonable. See *Heckler* v. *Community Health Servs.*, 467 U.S. at 65. In this case, not only should the plaintiffs be deemed to have known that they were not entitled to guaranteed leases under the Section 8, program, but the Section 8 leases they signed with the Authority provided actual notice to that effect. Had the plaintiffs sought legal advice, as might have been prudent, they would have known that the Authority representatives had misspoken. See *Rent Control Bd. of Cambridge* v. *Cambridge Tower Corp.*, 24 Mass. App. Ct. 75, 77-78 (1987).

Nor have the plaintiffs shown that they were so adversely affected by the conversion of their rental units to Section 8 that holding them to the conversions would be unjust. See *Heckler* v. *Community Health Servs.*, 467 U.S. at 63; *Gamache* v. *Mayor of No. Adams*, 17 Mass. App. Ct. at 294; *Stadium Manor, Inc.* v. *Division of Administrative Law Appeals*, 23 Mass. App. Ct. at 962-963. There is no dispute that, feeling the financial strain of not having had a rent increase under Section 23 for several years, the plaintiffs' concerns in 1975 centered on receiving rent increases. Funds in the budget for the Section 23 program were not available at the time to provide those increases. And nothing in their Section 23 leases or in the original letters of intent gave the plaintiffs the right to demand any rent increases over the course of their participation in the Section 23 program. While the judge did find that oral promises were made by the Authority to readjust the rents periodically, without any reference to specific dollar amounts, percentages, or formulas, these promises, if made, were of questionable value. Yet, with the conversion of the units to the Section 8 program, rent increases were granted. Moreover, between 1975 and 1980, the HUD regulations disadvantageous to the plaintiffs were ignored, and the Authority supplied tenants and paid rent for vacant units. There were significant benefits, therefore, that flowed to the plaintiffs as a result of the conversion to the Section 8 program, even if those benefits were not the motivating force for the conversions. Indeed, given the uncertainty what the rent levels would have been

had the plaintiffs remained in the Section 23 program, there is no way of assessing whether the conversions resulted in any actual losses to the plaintiffs.

Having concluded that the Authority is not liable to the plaintiffs, we vacate the partial judgment in their favor and order that judgment enter for the defendants. Costs are not to be awarded to either party.

*So ordered.*